# In the United States Court of Federal Claims

No. 23-84
(Filed: November 28, 2023)

* * * * * * * * * * * * * * * * * * * * * * * *

ERIC MOTE,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

    *Eric Mote*, pro se.

    *James W. Poirier*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *L. Misha Preheim*, Assistant Director, for defendant.

## OPINION

BRUGGINK, *Judge*.

    This is an action for military pay. The plaintiff, Eric Mote, seeks review of a decision of the Air Force Board for Correction of Military Records ("the Board"). In essence, plaintiff alleges that he is entitled to backpay and a correction of military records because his superior officers retaliated against him after he requested that they establish a "White Heritage Month" at his Air Force Base. At the time of the conduct underlying this action, plaintiff was a Captain in the Air Force,[1] plaintiff is seeking the removal of a Letter of Admonishment ("LOA") and a Non-Judicial Punishment ("NJP") from his records, and back pay for the amount of a fine associated with the NJP. The parties have cross-moved for judgment on the

---

[1] Prior to filing the complaint here, plaintiff was dismissed from the Air Force in a court-martial. *See* AR 169–71.

administrative record, and the matter is fully briefed.  For the reasons below, we grant the government's motion.

BACKGROUND

Plaintiff joined the United States Air Force in 2009 as an electrical engineer.  During his service, plaintiff attended several military schools at which he "demonstrated mastery of the school[s'] challenging curriculum." AR 220; *see also* AR 219–21.  In 2012, he was awarded an Air Force Achievement Medal.  In 2013, plaintiff was promoted to the rank of Captain. Throughout this entire period, plaintiff received positive performance reviews (including from those who later accused him of disrespectful behavior).

In late 2015, while he was stationed at Hill Air Force Base ("Hill AFB") as part of the Air Force Nuclear Weapons Center's Intercontinental Ballistic Missile ("ICBM") Systems Directorate, plaintiff requested that the wing commander, Colonel Ronald Jolly, establish a "White Heritage Month" at the base.  Colonel Jolly denied plaintiff's request for this special observance and explained that plaintiff failed to provide sufficient information for him to consider it.

Several months later, plaintiff again attempted to establish a White Heritage Month.  In his second application, plaintiff claimed that a "White Heritage Month will combat stereotypical behavior by increasing awareness of common white stereotypes and racial terms, such as redneck, hick, hillbilly, cracker, iceman, slaver, and so on."  AR 104.  In addition, plaintiff believed that White Heritage Month would also "mitigate stereotypical racial joke terms such as 'dumb blonde' jokes, 'you might be a redneck' jokes, and 'white boy can't jump' jokes."  AR 104.  Plaintiff also asserted that White Heritage Month would combat "the many racial stereotypes that associate whites with certain types of food: English muffins, Belgian waffles, French fries, Polish sausage, Swiss cheese, Italian ice, [and] Caesar salad."  AR 104. Finally, plaintiff's application listed approximately 30 potential speakers who could be invited to attend White Heritage Month events at the base.

On February 4, 2016, Colonel Jolly denied plaintiff's second application after reviewing it with his senior staff.  Colonel Jolly concluded that celebrating White Heritage Month would not further the special observance program's objectives, in that the proposal would "not encourage positive interaction, promote mutual respect, understanding, teamwork,

harmony, pride, or esprit de corps among all groups." AR 32. Colonel Jolly also determined that many of plaintiff's proposed speakers were "divisive and would create division at Hill Air Force Base." AR 104. During this decision-making process, Colonel Jolly did not involve plaintiff's command in order "to avoid any appearance of undue commander's influence." AR 100.

After plaintiff learned of Colonel Jolly's decision, he contacted the Equal Opportunity Office at Wright-Patterson Air Force Base. In his complaint to the Equal Opportunity Office, plaintiff maintained that White Heritage Month was simply a "special observance [that would be] on equal footing with all other [Air Force] special observances." AR 37. For that reason, he questioned whether the special observance program was "only for the benefit of non-whites." AR 37. He then accused the Air Force of allowing and supporting racial discrimination against white people. *See* AR 37 (asking whether it "is the policy of . . . the Air Force not to condone or tolerate unlawful discrimination . . . UNLESS the victims are white"); *id.* (asking whether "[s]pecial observances are conducted to recognize the continuous achievements of all Americans to American culture[] EXCEPT whites"); *id.* ("Let me know why . . . racial discrimination [against white people] is legitimate.").

Two weeks later, on February 22, 2016, plaintiff forwarded his complaint to Colonel Jolly, this time with the additional demand: "Please provide me with a complete list of changes I need to make to my application in order to get White Heritage Month approved. Thanks." AR 39. After this email, plaintiff met with two of his superior officers—Colonel Scott Jones, Director of the ICBM Systems Directorate, and Colonel Eric Felt, Division Chief of the ICBM Ground Division—to discuss plaintiff's recent behavior. Colonel Jones explained to plaintiff that he could continue to pursue a White Heritage Month but reiterated that plaintiff needed "to be careful about professionalism when [plaintiff] go[es] back at" a superior officer. AR 41. Colonel Jones reminded plaintiff about using "the proper channels" where they have been provided, and particularly, that while plaintiff was free to continue to pursue his White Heritage Month application, he should do so through Colonel Jolly's staff or other articulated channels rather than "tasking a wing commander." AR 41–42. Although plaintiff appeared somewhat confused about Colonel Jones's request, he agreed that he would "remember [his] military decorum" going forward. AR 42.

Plaintiff's renewed commitment to military decorum did not last long, however. A few days after his meeting with Colonel Jones, plaintiff attacked Colonel Jolly in an email dated March 10, 2016. Plaintiff accused Colonel Jolly of "sicc[ing] my chain of command on me in an apparent attempt to intimidate me." AR 44. He advised Colonel Jolly that the apparent intimidation was "probably not the most effective strategy because (1) it's not exactly [an offense] for an airman to contact his installation commander; and (2) resorting to intimidation only [gave] credence to the widespread suspicion that [Colonel Jolly] categorically intend[ed] to obstruct the establishment of White Heritage Month." AR 44. Plaintiff then asked Colonel Jolly to drop the "dubious and diversionary tactics" and send a memo saying, "Capt Mote, I will never approve your application for White Heritage Month because I have chosen to perpetuate my current policy of anti-white discrimination at this installation, so stop asking me." AR 44. Colonel Jolly forwarded this email to Colonel Jones with one comment: "Inappropriate." AR 104.

As a result, the Air Force, through Colonel Jones, issued an LOA against plaintiff for being disrespectful towards Colonel Jolly. The letter explained that plaintiff had been warned about respecting his superior officers and that the March 10 email was "a blatant disregard [of Colonel Jones'] previous instructions." AR 47. In addition, the letter indicates that Colonel Jones considered plaintiff's email to be a violation of Article 89 of the Uniform Code of Military Justice ("UCMJ"), disrespect toward a superior commissioned officer. Finally, the letter cautioned plaintiff that any "future disrespectful conduct . . . will result in more severe action." AR 47. Colonel Jones issued the LOA "because of Captain Mote's unprofessional communication with Colonel Jolly." AR 101. Colonel Jones specifically noted that "[t]he tone of the email was very unprofessional for communicating to a senior officer." AR 101.

Plaintiff was given the opportunity to consult with an Air Force lawyer before responding to the LOA and Captain Johnathan Hamilton was assigned to help plaintiff. Captain Hamilton reviewed plaintiff's draft rebuttal and provided a revised version, accompanied by the following explanation of his revisions:

> Please find attached a revised copy of your response. Feel free to give me a call to discuss. I think this will allow you to remain true to your ideas but also convey to your leadership that you understand the proper channels through which

grievances should be issued and the manner in which they should be expressed. As I said, my fear with the other response is that it could cut against the very idea of the LOA and do what the LOA warns against—namely show disrespect to senior officers. This response does not preclude you from using the avenues available to you, but does document the true intent behind your correspondence with Colonel Jolly and does so with the appropriate level of decorum between officers. Let me know your thoughts and concerns. Thank you.

AR 60. Plaintiff declined to adopt Captain Hamilton's revisions to his rebuttal.

In his rebuttal to the letter of admonishment, plaintiff accused Colonel Jolly of: (1) ignoring plaintiff's communications regarding Colonel Jolly's "unlawful discrimination against" plaintiff through the denial of the White Heritage Month proposal; (2) contacting plaintiff's chain of command and requesting that plaintiff be "disciplined, intimidated, or otherwise discouraged from communicating with him"; and (3) dealing with plaintiff in an "ostensibly dishonest and disingenuous" manner. AR 49. Plaintiff maintained that his communications with Colonel Jolly were mandated by Air Force instructions, which generally require complaints to be resolved "at the lowest level possible." AR 49. Plaintiff believed that these instructions entitled him to bring his allegations directly to Colonel Jolly. Plaintiff also asserted an affirmative defense to the Article 89 violation: that Colonel Jolly's actions meant that Colonel Jolly had lost the entitlement to respect protected by Article 89. Finally, plaintiff contended that the letter of admonishment was an unlawful act of reprisal against a whistleblower under the Military Whistleblower Protection Act ("MWPA"), 10 U.S.C. § 1034. Ultimately, plaintiff's superior officers disagreed, and Colonel Jones ordered the letter of admonishment to remain in effect.

Subsequently, plaintiff filed a reprisal complaint against Colonels Jones and Felt, and a discrimination complaint against Colonel Jolly, both of which were found to be unsubstantiated.[2] Plaintiff then filed an Inspector General ("IG") complaint, alleging that Colonels Jones and Felt had colluded in making their witness statements regarding the discrimination complaint, and that Colonels Jones and Jolly lied in their witness statements. Plaintiff

---

[2] Plaintiff did not present these complaints to the Board, nor are they included in the administrative record.

voluntarily dismissed the first part of his complaint shortly after filing the complaint.  After an investigation, the remaining allegations were dismissed.

Later that year, Hill AFB hosted a diversity festival.  Plaintiff expressed interest in operating a white heritage booth.  In an email dated August 19, 2016, Colonel Jones instructed plaintiff that because his proposed white heritage organization was not an approved Department of Defense organization, he could not set up a festival booth or distribute literature. Nonetheless, plaintiff was still "welcome to come to the event and participate just like any member at Hill AFB."  AR 82.

Plaintiff attended the diversity festival and used the event to stir up trouble among the participants.  An Air Force Commander Directed Investigation ("CDI") report found that plaintiff was "making people feel uncomfortable," "annoying booth attendants and guests," and "looking for a fight."  AR 86.  For example, it appears that plaintiff visited each booth and questioned why there was not a white heritage booth at the festival.  In addition, he asked a white female who was working the American/Pacific Islander Heritage booth, "Why are you in the booth?  You are not Asian." AR 86.  Then, at the Women's History booth, plaintiff interrupted the booth attendant's conversation with a guest and interjected, "Did you also know that she was a white woman?"  AR 86.  Plaintiff later returned to the Women's History booth where Technical Sergeant Hughes ("TSgt Hughes") was the attendant.  TSgt Hughes was aware of plaintiff's behavior at the festival and as plaintiff approached the booth, TSgt Hughes said, "So I'm going to tell you right now, you are not going to come over here and talk to me about this."  AR 84.  Plaintiff continued to spend much of his time in front of the Women's History booth, and they had a discussion during which TSgt Hughes' "tone of voice and choice of words [did] approach what would be considered disrespectful."  AR 85.  However, the CDI report noted that other evidence confirmed that plaintiff "targeted [TSgt Hughes] for extended questioning and baited her with inflammatory rhetoric."  AR 85.  Colonel Pelletier, TSgt Hughes' commanding officer, was present for this discussion, and was the subject of one of plaintiff's allegations in the CDI: "that Col Pelletier wrongfully allowed TSgt Hughes to behave with disrespect toward Capt Mote . . . ."  AR 91.  With respect to this allegation, the CDI report noted that while TSgt Hughes' "choice of words and tone could be considered a violation of Article 89," plaintiff was "baiting" her and laughing when she attempted to answer his questions.  AR 86.  The report concluded that the preponderance of evidence showed that plaintiff's allegations were not substantiated, and his appeal was later denied.

Several months later, on January 6, 2017, Colonel Jones issued a memorandum about the "Air Force Equal Opportunity (EO) and Sexual Harassment Policy." AR 120. On January 9, 2017, plaintiff responded to the memo by writing the following email to Colonel Jones and Major General Jansson[3]:

The Equal Opportunity Zero Tolerance memo you sent out today generated quite a bit of laughter around the office here. We decided to make a few corrections so the policy would be a little more representative of reality:

The ICBM Systems Directorate strives to maintain an anti-white discriminatory work environment, without regard to how many man-hours it wastes or how detrimental it is to the unit's effectiveness. I am determined to ensure that everyone can discriminate against whites in an environment free of consequences.

I have Zero Tolerance for anyone who alleges unlawful discrimination. Objecting to wrongful conduct, making accusations against my friends, filing complaints against anyone of a higher rank, or drawing attention to my arbitrary disregard for federal regulations and Air Force standards will not be tolerated in any instance.

My "Equal Opportunity" Zero Tolerance policy is just a legal formality that I have to publish from time to time. Mostly I use it to deceive complainants into thinking I have any concern for them or that I will help them resolve issues, when in fact I and my staff will use information reported to me to assist further in the discrimination and harassment efforts that the complainants are already enduring.

If you or any member of your team has been accused of unlawful discrimination, immediately report it to me so I can take reprisal against your accuser and begin preparing false

---

[3] General Jansson was the commander of the Air Force Nuclear Weapons Center and one of Colonel Jones' superior officers.

statements to disrupt the investigation so as to prevent any potentially adverse effects to your career.

As Airmen, we must ensure we maintain an environment free of allegations and complaints. By following the guidance in this memorandum, we can make sure all my friends look good in front of their promotion boards and we can prevent horrible problems like honesty, consistency, and sincerity from interfering with our critically important career paths.

Integrity First – we'll dump the other core values later.

AR 122.

Only a few days later, on January 13, 2017, plaintiff sent Colonel Jones and General Jansson a second email that read:

At yesterday's All Call, you [Colonel Jones] didn't seem to understand the reason for the snickering and mumbling from the crowd. Let me explain.

You started out by announcing your "zero tolerance" policies—you don't tolerate this behavior or that behavior. Zero tolerance! Then, a couple slides later, you pulled up the "Diversity & Inclusion Continuum":

Hate—Intolerance—Tolerance—Acceptance—Inclusion

You explained that hate is bad, and that we need to move everything toward inclusion. At this point, people were thinking, "So, where does your *zero tolerance* stuff align on this continuum? Pretty far to the left, yeah?"

You essentially argued that your policies are hateful and illegitimate and should be done away with. That's why people were murmuring about—that you were standing up there as if you were completely unaware of the hypocrisy of your own statement.

That is why your employees don't take this unit seriously. We all put down our work yesterday, drove across the base, piled

into an auditorium, and spent an hour listening to a rote recitation of directorate policies that fully contradicted each other.  When we got back to our desks, we didn't know whether we were supposed to be executing the mission, or lighting a candle, holding hands, gazing into each other's eyes, singing kumbaya, and blabbing nebulously about inclusion.  Actually, instead of doing either of these, folks mostly sat around mocking and laughing about all of this.

Diversity is all we do!—excellence is outdated and politically incorrect.

AR 124.

Because of these two emails, on January 17, 2017, General Jansson charged plaintiff with "Disrespect Toward a Superior Officer" under Article 89 of the UCMJ and proposed an NJP under Article 15 of the UCMJ.  Plaintiff had 72 hours within which to respond to the NJP or request a court martial proceeding instead.  Plaintiff was assigned military defense counsel, Captain Anne Delmare, and spoke to her later in the same day, January 17.  Captain Delmare's initial advice was that it was in plaintiff's "best interest to fight this in the Article 15 forum," as plaintiff's proposed defenses were "very unlikely" to be successful in a court martial forum.  AR 145.  Plaintiff sent various documents to Captain Delmare for her review on January 18; however, she was unable to review them immediately.  On the morning of Friday, January 20 (the end of the 72-hour response period), Captain Delmare sent plaintiff a proof analysis of the charge against him and reiterated her advice to accept the NJP proceedings.  In her view, it was "[v]ery likely the [court martial panel] members would find the email[s] sent by Capt Mote to be disrespectful to a superior commissioned officer."  AR 148.  Captain Delmare also maintained that it was "[v]ery unlikely the [court martial panel] members would find beyond a reasonable doubt that Colonel Jones abandoned his status," thus eliminating plaintiff's affirmative defense.  AR 148.  Captain Delmare also indicated that plaintiff could request an extension of time before his response was due, however plaintiff submitted his response before receiving this email.

Plaintiff waived his right to court martial proceedings and pleaded "not guilty" to the charge against him.  In his written response to the NJP, plaintiff claimed that his emails to Colonel Jones were simply "protests against the latest iterations of Colonel Jones' misconduct: namely his

dishonest representation of his own policies." AR 132. Plaintiff argued that the MWPA immunized him from punishment for his emails to Colonel Jones. Plaintiff also argued that Colonel Jones was not entitled to the respect afforded by Article 89 "while engaged in plain violations of standards, especially standards like anti-discrimination policies." AR 133.

General Jansson disagreed with plaintiff and found him guilty of disrespect toward a superior officer. As punishment, plaintiff was reprimanded and forfeited $2,828 pay per month for two months. Plaintiff appealed the Article 15 punishment, but his appeal was denied by both General Jansson and the appellate authority. Plaintiff also filed a whistleblower complaint with the Department of Defense IG alleging that the NJP was an act of reprisal, which was later dismissed by the IG.[4] Subsequently, on June 7, 2017, plaintiff filed an application with the Board seeking for the LOA and NJP to be removed from his records.

The Board considered plaintiff's application and ultimately denied the application because it found "insufficient evidence of an error or injustice." AR 1; *see also* AR 7. In addition, the Board found "insufficient evidence to conclude that [plaintiff was] the victim of reprisal." AR 1; *see also* AR 7. Plaintiff now appeals the Board's decision.

DISCUSSION

I. **Jurisdiction**

This court has jurisdiction to review the decisions of military corrections boards, including the Air Force Board for Correction of Military Records. *Friedman v. United States*, 159 Ct. Cl. 1, 26 (1962). As plaintiff is seeking back pay for his two months of forfeited pay under the NJP, this case falls within the Tucker Act, 28 U.S.C. § 1491. *See Lewis v. United States*, 458 F.3d 1372 (Fed. Cir. 2006).

II. **Standard of Review**

---

[4] The IG determined that the two emails to Colonel Jones were not protected communications under 10 U.S.C. § 1034(b)(1)(B) because the "content of the email[s] did not specifically reflect any allegation of violation of a law or regulation." AR 161–62. The IG also noted that both emails "were done in a mocking and disrespectful manner." AR 162.

The parties have made cross-motions for judgment upon the administrative record under Rule 52.1(c) of the Rules of the United States Court of Federal Claims. When considering these motions, the court must uphold the "decision of [a military correction board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010). Under the arbitrary and capricious standard, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Only the "most egregious decisions" may be reversed under this standard. *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1515 (D.C. Cir. 1989).

## III.    Analysis

The Board made two significant conclusions based on the evidence presented. First, that plaintiff was "not the victim of an error and injustice," and therefore, that there was "no basis to recommend granting any of the relief sought." AR 7. And second, that plaintiff was not the "victim of reprisal." AR 7. We review each conclusion in turn and address whether each conclusion is supported by substantial evidence as required by the arbitrary and capricious standard.

### a.  The LOA and NJP are supported by substantial evidence.

The Board concluded that:

After thoroughly reviewing all Exhibits, it is the Board's opinion that the applicant is not the victim of an error and injustice. The Board concurs with the rationale and recommendation of AFPC/DP2SSM and AFLOA/JAJM and finds that a preponderance of the evidence does not substantiate the applicant's contentions. Therefore, the Board concludes the applicant has failed to sustain his burden of proof that he has been the victim of an error o[r] injustice. In view of the above and in the absence of persuasive evidence to the contrary, the Board finds no basis to recommend granting any of the relief sought in this application.

11

AR 7.  We first consider whether this conclusion is supported by substantial evidence as related to the LOA.

Plaintiff received the LOA for disrespecting a superior commissioned officer, Colonel Jolly, in the March 10 email.  The LOA specifically identifies two portions of the email that were particularly disrespectful: "Not only did you fail to reply to that email, you instead sicced my chain of command on me in an apparent attempt to intimidate me—probably not the most effective strategy because (1) it's not exactly . . . to obstruct the establishment of White Heritage Month" and "If that is the case, there is no need for these dubious and diversionary tactic[s]."  AR 47 (first alteration in original).  In the LOA, Colonel Jones also noted that he had previously cautioned plaintiff that he must be "professional and respectful in [his] dealings with the Wing Commander."  AR 47.  Colonel Jones concluded that the March 10 email was in "blatant disregard for [Colonel Jones'] previous instructions to [plaintiff], but also [a] direct violation of Article 89 of the UCMJ."  AR 47.

When issuing an LOA, commanders are instructed to use the "preponderance of the evidence" standard to evaluate evidence and the elements of the offenses committed.  AR 300 (AFI 36-2907, dated 26 November 2014, para. 4.1.3).  LOAs should not be used when "a reprimand is more appropriate."  AR 301 (AFI 36-2907, dated 26 November 2014, paragraph 4.3).

The March 10 email itself is more than substantial evidence to support the Board's conclusion that there was no error or injustice relating to the issuance of the LOA.  The email is confrontational and accusatory, baselessly accusing Colonel Jolly of intimidation, of anti-white bias, and dishonesty.  Colonel Jones issued the LOA as a "direct result" of plaintiff's tone and word choice in the email.  AR 101.

The record does not show any evidence of anti-white bias or dishonesty on the part of Colonel Jolly.  Plaintiff alleges that Colonel Jolly rejected his White Heritage Month observance "in bad faith" and "for the purpose of shrouding an illegal and racially discriminatory decision."  Pl.'s Cross-Mot. and Rep. to Def.'s Mot. for J. on the Administrative R. at 7 [hereinafter "Cross-Mot. and Rep."], ECF No. 16.  Plaintiff's only evidence for this is Colonel Felt's statement: "I don't think any Wing Commander would approve a White Heritage Observance because it is too controversial."  AR 58.  Plaintiff characterizes this statement as "Colonel Felt believ[ing] that

Colonel Jolly had no intention of approving a White Heritage Observance, not because of any particular problem with plaintiff's application, but because it was politically beneficial for him to reject it." Cross-Mot. and Rep. at 7. However, the record shows that Colonel Felt's statement was his own personal opinion, and Colonel Jolly had not told Colonel Felt that Colonel Jolly "would never" approve the request for a White Heritage Month. AR 58. Other than the bare assertions and allegations in plaintiff's various submissions, *see, e.g.*, AR 22 (application to the Board), 49–50 (rebuttal to LOA), the record does not contain evidence of anti-white bias or dishonesty by Colonel Jolly.

In contrast, the record shows that Colonel Jolly rejected the application for valid reasons. The first application was rejected because it contained insufficient information. AR 30; *see also* AR 103 ("[Plaintiff's first submission] didn't have sufficient information that warranted my approval. Captain Mote merely stated his request should be approved because other Observances were approved . . . . We requested Captain Mote provide more details, which he declined to provide."). And the second application was rejected after review by Colonel Jolly and his staff because Colonel Jolly found that plaintiff's "proposed events [would] not encourage positive interaction, promote mutual respect, understanding, teamwork, harmony, pride, or esprit de corps among all groups." AR 32; *see also* AR 103–04 (explaining which portions of plaintiff's application were particularly divisive). Given this evidence, the email meets the preponderance of the evidence standard for the issuance of the LOA.

The transcript of the meeting between plaintiff and his superior officers, where Colonel Jones advised plaintiff to be aware of professionalism in plaintiff's further dealings with Colonel Jolly is further evidence supporting the LOA. In the meeting, Colonel Jones cautioned plaintiff about "tasking a wing commander" and specifically instructed plaintiff about keeping a "respectful" tone when communicating with Colonel Jolly. AR 42. This meeting is evidence that Colonel Jones' previous efforts to reprimand plaintiff about disrespectful behavior were not effective. Thus, an LOA was suitable here because merely reprimanding plaintiff would not have been appropriate at this point.

Plaintiff does not argue that the Board's conclusion is not supported by substantial evidence, instead he presents a series of affirmative defenses: that the LOA was an act of reprisal, or alternatively an abuse of authority; that the AFMC/IG office abused the Reprisal Acid Test; that he was deprived

13

of proper legal assistance; and that at least one of the officials responsible for administering the LOA had an illegal motive. Cross-Mot. and Rep. at 1–3.[5] Plaintiff's chief complaint with his legal assistance seems to be not that he was actually deprived of legal assistance—he admits that he was in fact given legal assistance—but rather that he was dissatisfied with the advice that he was given. *See* Compl. at 6, ECF No. 1; AR 13.

After the LOA was issued, plaintiff had the opportunity to confer with Air Force counsel before providing a written response. Captain Hamilton reviewed plaintiff's draft response and provided a revised version that he believed would "allow [plaintiff] to remain true to [plaintiff's] ideas but also convey to [plaintiff's] leadership that [plaintiff] understand[s] the proper channels through which grievances should be issued and the manner in which they should be expressed." AR 60; *see also* AR 61–63 (suggested revisions to draft response). In his complaint here, plaintiff describes this as: "[Captain Hamilton] reviewed [plaintiff's draft of his LOA response] and recommended that effectively all of plaintiff's citations to various laws and regulations that tended toward his defense be removed and that plaintiff instead apologize and confess to some form of misconduct." Compl. at 6. In plaintiff's view, these revisions were not in his "best interest," and he requested a different lawyer be provided to him. AR 65. Plaintiff's response was due before his new lawyer could be assigned, and he chose not to request an additional extension because he "believed it would prejudice [his] defense to inform [his] accusers that [he] needed to wait for new counsel because [his] prior counsel was advocating [his] supposed guilt." AR 13. There is nothing in the record to suggest that Captain Hamilton's legal advice was improper, and plaintiff was not deprived of legal assistance simply because he did not like Captain Hamilton's advice.

Plaintiff also argues that Colonel Felt expressed an illegal motive for retaining the LOA in plaintiff's records after plaintiff's response. Colonel Felt stated that plaintiff's response "provided reasons why he did what he did instead of taking responsibility for his action." AR 58. Plaintiff argued to the Board that this statement meant that "Colonel Felt faulted [plaintiff] for pleading [his] own innocence and refusing to express guilt." AR 24.

Plaintiff raised these defenses in his initial application to the Board, and again in his response to the Air Force's evaluations of his application—both documents that the Board considered in reaching its conclusion. *See*

---

[5] We address reprisal separately below.

14

AR 7 ("After thoroughly reviewing all Exhibits, it is the Board's opinion that the applicant is not the victim of an error and injustice."). Contrary to plaintiff's assertions, there is no evidence that the Board "arbitrarily disregarded" his defenses. *See* Cross-Mot. and Rep. at 3. The Board came to a conclusion after a holistic review of all of plaintiff's claims.

Therefore, we find that substantial evidence supports the issuance of the LOA. Moving to the NJP, there is also substantial evidence to support this punishment. Plaintiff received the Article 15 NJP for violating Article 89 of the UCMJ in two emails that he sent to Colonel Jones: one dated January 9, 2017, and the other dated January 13, 2017. The first email is a mocking rewrite of the Equal Opportunity and Sexual Harassment policy that Colonel Jones sent out to the base. The second email was an unwarranted response to a meeting held on base where Colonel Jones discussed the policy.

In the first email, plaintiff wrote to his superior officer, Colonel Jones, with a derisive parody of the discrimination and sexual harassment policy. In his application to the Board, plaintiff describes this email as explaining "that Colonel Jones' policy was a pretentious farce" and that his "corrected version . . . described [Colonel Jones'] actual policy (a delineation of the various wrongs he has committed against me)." AR 19. For example, the first paragraph of the policy reads as follows:

> The ICBM Systems Directorate strives to provide a positive and safe work environment conducive to the effective completion of our mission. As Director, I am determined to ensure that all ICBM Systems Directorate personnel have the opportunity to perform their duties in an environment free from the negative effects of unlawful discrimination and sexual harassment.

AR 120. Plaintiff rewrote it as follows:

> The ICBM Systems Directorate strives to maintain an anti-white discriminatory work environment, without regard for how many man-hours it wastes or how detrimental it is to the unit's effectiveness. I am determined to ensure that everyone can discriminate against whites in an environment free of consequences.

AR 122. And the final paragraph of the original policy reads:

15

As Airmen, both military and civilian, we must be ensure [sic] that we maintain an environment free from discrimination and harassment.  By following the guidance in this memorandum, we can uphold a dignified and respectful workplace to protect our people and our critically important mission.

AR 120.  Plaintiff's version was:

As Airmen, we must ensure we maintain an environment free of allegations and complaints.  By following the guidance in this memorandum, we can make sure all my friends look good in front of their promotion boards and we can prevent horrible problems like honesty, consistency, and sincerity from interfering with out critically important career paths.

AR 122.

Plaintiff sent the second email after a base meeting about the policy. In the email, he attacks Colonel Jones as hypocritical and disparages the anti-discrimination policies.  For example, the email states in part:

You started out by announcing your "zero tolerance" policies—you don't tolerate this behavior or that behavior. Zero tolerance!  Then, a couple slides later, you pulled up the "Diversity & Inclusion Continuum":

Hate—Intolerance—Tolerance—Acceptance—Inclusion

You explained that hate is bad, and that we need to move everything toward inclusion.  At this point, people were thinking, "So, where does your *zero tolerance* stuff align on this continuum?  Pretty far to the left, year?"

You essentially argued that your policies are hateful and illegitimate and should be done away with.  That's what people were murmuring about—that you were standing up there as if you were completely unaware of the hypocrisy of your own statement.

AR 124.  Plaintiff also stated that after the meeting, "When we got back to our desks, we didn't know whether we were supposed to be executing the mission, or lighting a candle, holding hands, gazing into each other's eyes, singing kumbaya, and blabbing nebulously about inclusion."  AR 124.

In his response to the NJP proceedings, plaintiff admits that these emails were disrespectful.  Plaintiff argued that Colonel Jones' own misconduct meant that Colonel Jones was no longer entitled to respect protected by Article 89.  Plaintiff provided examples of this alleged misconduct and stated:

> Federal laws and service regulations condemn all these actions by Colonel Jones.  So, if the federal government denounces his conduct in these regards, why am I not entitled to join in on the denunciation?  It is his behavior, not mine, that brings disrespect upon him.
>
> . . . My accusations and derogations have been asserted exclusively with reference to his illegal conduct and the corresponding injuries I have sustained . . . . In all situations wherein he comports himself according to the standards commensurate with his office, I have shown him the proper respect that is due him under such circumstances.

AR 134.

Both emails are mocking, reductive, and stridently rude.  They are clearly disrespectful, and plaintiff admitted as much within the record.  They provide more than substantial evidence to support the Board's conclusion relating to the NJP.

Plaintiff does not argue that the NJP is not supported by substantial evidence, but again presents a series of affirmative defenses, largely duplicative of those argued for the LOA: that the NJP was an act of reprisal, or alternatively an abuse of authority; that the DoD/IG office misconducted the "Reprisal Acid Test;" that there existed a double standard as to Article 89 divesture applied to plaintiff; and that he was deprived of proper legal assistance.  Cross-Mot. and Rep. at 3–6.

Plaintiff argues that "the threshold of misconduct needed to divest an officer of Article 89 protections was altered significantly depending on

whether plaintiff was the originator or recipient of allegedly disrespectful conduct." Cross-Mot. and Rep. at 5. Plaintiff contends that he was divested of Article 89 protections for allegedly being "annoying" in the Diversity Festival incident, *id.*; *see* AR 86, whereas the standard applied to plaintiff's superior officers was "modified to such heights that intimidation, reprisal, racial discrimination, and false official statements were collectively unable to breach it," Cross-Mot. and Rep. at 5. The Diversity Festival CDI report did describe plaintiff's behavior as "annoying," but the report also states that "Capt Mote targeted [redacted] for extended questioning and baited her with inflammatory rhetoric." AR 85 (alteration in original). The report also states that plaintiff was "looking for a fight," "making people feel uncomfortable," and indicated that he was "going to go get his stuff to set up a booth" "in direct violation of the direct order given to him by his commander." AR 85. Plaintiff's conduct in its entirety was what led to the divesture of his Article 89 protections. In contrast, plaintiff does not point to any specific evidence in the record of misconduct by Colonel Jones that would divest Colonel Jones of his protections. He relies instead on his general allegations of reprisal and racial discrimination. *See* Cross-Mot. and Rep. at 5.

Plaintiff also alleges that he was deprived of proper legal assistance in responding to the Article 15 NJP. He contends that, "Plaintiff had a Sixth Amendment right to a lawyer who understood these and other federal laws applicable to his case and could wield them effectively in his defense." *Id.* Plaintiff's objection here seems to be with the quality of his lawyer, not his access to a lawyer.

To first address plaintiff's contention that he had a right under the Sixth Amendment in these Article 15 NJP proceedings, it is necessary to note that in contrast to court-martial proceedings, Article 15 proceedings are an "administrative method of dealing with the most minor offenses." *Middendorf v. Henry*, 425 U.S. 25, 31–32 (1976). Congress has also explicitly stated that Article 15 proceedings are noncriminal proceedings: "Since the punishment is nonjudicial it is not considered as a conviction of a crime and in this sense has no connection with the military court-martial system." S. Rep. No. 87-1911, at 2 (1962). As such, Article 15 proceedings are not "criminal prosecutions" within the meaning of the Sixth Amendment. *Dumas v. United States*, 223 Ct. Cl. 465, 475 (1980).

This does not mean, however, that plaintiff had no right to counsel. The Article 15 paperwork states: "You have the rights listed on Page 3 under 'Rights of member.' Including the right to consult a lawyer before making

18

any decision, and to have a lawyer assist you throughout the proceedings. You have an appointment scheduled with the Area Defense Counsel."  AR 126; *see also* AR 128 (Page 3 of the paperwork, includes the same language). Plaintiff indicated that he understood the rights and that he had consulted a lawyer before waiving his right to court-martial.  AR 126 (see plaintiff's initials in box 3(a) indicating this).

There is no evidence that plaintiff was denied the right to consult a lawyer or have a lawyer assist him throughout the proceedings.  In his application to the Board, plaintiff states that he spoke with his assigned lawyer, Captain Delmare, the same day that he was offered the NJP.  AR 19. Plaintiff sent materials to Captain Delmare for her to review and base her advice on.  While there was a delay in Captain Delmare's response, plaintiff did not request an extension for additional time to confer with his counsel prior to responding, and instead accepted the Article 15.  However, plaintiff's primary objection to the adequacy of his counsel was that Captain Delmare was "an incompetent lawyer."  AR 21.  Plaintiff based this characterization primarily on Captain Delmare's proof analysis which addresses several prongs of a potential defense case if plaintiff had elected court-martial and discusses the issues with potential defenses.

Plaintiff takes particular issue with Captain Delmare's advice regarding plaintiff's proposed MWPA defense.  While we address the merits of the MWPA reprisal claim below, we will briefly address it in the context of this argument first.  The MWPA prohibits retaliation against members of the armed forces for making certain protected communications.  *See* 10 U.S.C. § 1034.  Captain Delmare noted that one issue with this defense was that the emails plaintiff sent to Colonel Jones were "unprofessional on their face, and not a protected communication."  AR 150.  Plaintiff maintains that Captain Delmare's interpretation of the MWPA is incorrect and thus she was "an incompetent lawyer."  AR 21.  This objection is not persuasive, however, because while plaintiff had the right to consult a lawyer and to have a lawyer assist him in the Article 15 proceedings, he did not have a guaranteed right to a lawyer who agreed with his interpretation of the MWPA.

As with his defenses to the LOA, plaintiff raised these defenses in several submissions to the Board and the Board evaluated those submissions and the attached exhibits in reaching its conclusion.  There is no evidence that the Board "arbitrarily disregarded" his defenses.  *See* Cross-Mot. and Rep. at 5.

19

The record does not contain any evidence of any discrimination against plaintiff, but the record is replete with instances of his engaging superior officers in a mocking and hostile way. Both the LOA and the NJP are supported by substantial evidence. Therefore, the Board's conclusion that plaintiff was not the victim of an error and injustice was not arbitrary or capricious.

### b. Neither the LOA nor NJP were illegal reprisals.

The Board's second conclusion was that:

> The applicant alleges he has been the victim of reprisal and has not been afforded full protection under the Whistleblower Act (10 USC § 1034). The Board notes the applicant filed an IG complaint; however, AFNWC/IG reviewed the allegations, and the findings were unsubstantiated, to include alleged reprisal. Nevertheless, in accordance with 10 USC § 1034, the Board reviewed the evidence of record to reach its own independent determination of whether reprisal occurred. Based on the Board's review, they do not conclude the applicant has been the victim of reprisal. The Board states the applicant has failed to establish that the actions to issue him a Letter of Admonishment (LOA) on 18 Mar 16 or the Non-judicial Punishment (NJP) under Article 15 of the UCMJ imposed on 23 Jan 17, are in reprisal for his making a protected communication. Therefore, the Board does not find the applicant has been the victim of reprisal pursuant to Title 10, U.S.C. Section 1034.

AR 7.

The MWPA provides that:

> No person may take (or threaten to take) an unfavorable personnel action, or withhold (or threaten to withhold) a favorable personnel action, as a reprisal against a member of the armed forces for making or preparing or being perceived as making or preparing . . . a communication that is described in subsection (c)(2) and that is made (or prepared to be made) to . . . any person or organization in the chain of command.

20

10 U.S.C. § 1034(b)(B)(iv).  Subsection (c)(2) describes protected communications and states, in relevant part:

> A communication described in this paragraph is a communication in which a member of the armed forces complains of, or discloses information that the member reasonably believes constitutes evidence of, any of the following:
> (A) A violation of law or regulation, including a law or regulation prohibiting rape, sexual assault, or other sexual misconduct . . . , sexual harassment, or unlawful discrimination.
> (B) Gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

*Id.* § 1034(c)(2).

The Federal Circuit has interpreted a similar provision of a similar statute in *Lachance v. White*, 174 F.3d 1378 (Fed. Cir. 1999),[6] and determined that the test for a "reasonable belief" in the whistleblower context is: "[C]ould a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the [whistleblower] reasonably conclude that the actions . . . evidence [wrongdoing]?"  *Id.* at 1381.  The court went on to say that "A purely subjective perspective of an employee is not sufficient even if shared by other employees."  *Id.*  We find this test applicable in this context.

Plaintiff argues here, and argued in his application to the Board, that both the LOA and the NJP were illegal acts of reprisal for his allegations of discrimination and dishonesty against Colonels Jolly and Jones.  In order for the LOA and NJP to be reprisals, the emails underlying each must have been

---

[6] The court there was interpreting the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) (1994), which applies to personnel actions taken because of "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidence—(i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."

protected communications.  Therefore, we will address each in light of the test set forth above.

With respect to the LOA, Plaintiff argues that it was issued in reprisal for his allegations of discrimination, dishonesty, and intimidation against Colonel Jolly in the March 10, 2016 email.  Plaintiff's allegations of discrimination are based entirely on Colonel Jolly's denial of plaintiff's White Heritage Month application.  Plaintiff claims that he "requested that whites be afforded the same opportunities that all other races at Hill AFB enjoy" and that "Colonel Jolly had the discretionary authority and obligation to grant such equal opportunity," but that Colonel Jolly refused to do so.  AR 22.  However, there is no evidence in the record of Colonel Jolly actually engaging in discriminatory behavior.  As discussed above, Colonel Jolly denied plaintiff's applications for valid, non-discriminatory reasons.

Similarly, plaintiff's allegations of dishonesty are not based on any reliable evidence.  These allegations are based on his beliefs and a single statement of another person's opinion.  Colonel Jolly did not answer plaintiff's question about how to correct plaintiff's application for a White Heritage Month, "[Plaintiff] believe[s], because the true answer was that he would never approve the application, no matter how well it satisfied the criteria."  AR 14.  Additionally, based on Colonel Felt's opinion statement that no Wing Commander would approve such an application, plaintiff concluded that "the application process was a farce, and Colonel Jolly's nominal justification for rejecting my application was dishonest."  AR 14.  There is no evidence in the record that Colonel Jolly was dishonest when interacting with plaintiff or his applications.

Plaintiff's allegations of intimidation are based on his, unsupported, belief that Colonel Jolly "encouraged [plaintiff's] leadership to exert their influence to prevent [plaintiff] from asking further questions" about the White Heritage month observance.  AR 23.  Plaintiff claims that Colonel Jolly "contacted [plaintiff's] chain of command, Colonel Jones, and asked him to exert some influence upon [plaintiff] to discourage any further difficult questions for Colonel Jolly on the subject."  AR 12.  This apparently resulted in the meeting between plaintiff, Colonel Jones, and Colonel Felt.  However, there is nothing in the record that indicates that Colonel Jolly did this.  In a witness statement Colonel Jones indicated that Colonel Jolly did not contact him to discuss the merits of the White Heritage observance.  Colonel Jolly only informed Colonel Jones of the situation because plaintiff

was a member of his directorate.  *See* AR 104.  In records made as a part of the IG investigation, it is noted that:

> Col Jolly was concerned that the complainants continued requests to have the observance had become disrespectful and improper, therefore he called Col Jones to ensure he was aware and could address the issue with his subordinate, the complainant.  There is no evidence that the subjects discussed the merits of the requested special observance.

AR 180.  There is no evidence that Colonel Jolly attempted to influence plaintiff into abandoning his pursuit of a White Heritage observance.

Even when Colonel Jones met with plaintiff, he did not attempt to forbid plaintiff from "asking further questions" or otherwise continuing to get White Heritage Month approved.  Instead, Colonel Jones was concerned with plaintiff's professionalism and military decorum in his future dealings with Colonel Jolly.   Colonel Jones suggested taking up future communications with Colonel Jolly's staff, and even when plaintiff was to engage directly with Colonel Jolly, that plaintiff should do that respectfully.  For example, Colonel Jones said: "You're pursing this, and that's good, and there's avenues for you to pursue that.  But you've got to be careful about professionalism when you go back at a wing commander.  I just ask that you keep that in mind when you're doing what you're doing."  AR 41.  And later in the meeting, also said: "I'm not saying you can't pursue it.  I'm not trying to say that at all.  But please remember your military decorum in the process."  AR 42.

Based on these essential facts, a disinterested observer would not have reasonably concluded that Colonel Jolly's actions were evidence of any of the wrongs that plaintiff alleged.  Plaintiff's email to Colonel Jolly was not a communication in which plaintiff disclosed information he reasonably believed constituted evidence of a violation of law or regulation and was not a protected communication under the MWPA.  The Board's conclusion that the LOA was not an illegal reprisal was not arbitrary or capricious.

Now moving to the NJP, there are two underlying emails.  The first was plaintiff's re-write of Colonel Jones' Equal Opportunity and Sexual Harassment Policy, and the second was a follow up after a base meeting regarding the policy.  Plaintiff argued to the Board that these emails

Case 1:23-cv-00084-EGB   Document 20   Filed 11/28/23   Page 24 of 26


contained allegations of false official statements, a racially discriminatory work environment, and reprisals by Colonel Jones.

Plaintiff's allegations of false official statements and racial discrimination are linked. Plaintiff contends that "[h]aving been personally subjected to [Colonel Jones'] repeated discriminatory actions," he "objected to the dishonest nature of [the] memorandum," AR 19, and "clearly allege[d] that [Colonel Jones'] 'zero tolerance' policy was dishonest and inconsistent with his previous actions," AR 308. Plaintiff seems to assert that Colonel Jones was dishonest because Colonel Jones discriminated against plaintiff, and therefore it was disingenuous for Colonel Jones to issue an anti-discrimination policy. Plaintiff made unsupported and unexplained allegations of discrimination to the Board, *see* AR 18 ("[Colonel Jones'] general tolerance of the various forms of anti-white discrimination the Hill AFB leadership had perpetrated against [plaintiff], and [Colonel Jones'] failure to intervene on [plaintiff's] behalf, at least to protect [plaintiff] from such discrimination, if not to help [plaintiff] actually reverse it."), but it is unclear what these "various forms of anti-white discrimination" were, or how Colonel Jones is culpable for that discrimination.

The only specific allegation of discrimination that plaintiff made to the Board was Colonel Jones' order regarding the Diversity Festival. To the Board, plaintiff argued that he "provided evidence that Colonel Jones abused his authority by preventing racial equality and diversity at the 2016 Diversity Festival in that he illegally ordered me not to participate in the Festival as a booth operator." AR 310. The entirety of this evidence is the August 19, 2016 email that Colonel Jones sent to plaintiff instructing plaintiff not to "attempt to set up an additional booth or other display" at the Diversity Festival. AR 82. In that email, Colonel Jones stated that:

> The Team Hill Diversity Council Festival on 20 Aug 16 is for the 10 [Department of Defense] approved set of recognized organizations. Your proposed White Heritage organization is not an approved [Department of Defense] organization. The 10 booths are the only booths authorized and approved . . . for this year's event.

AR 82. Colonel Jones concluded the email by reminding plaintiff that he was "welcome to come to the event and participate just like any member at Hill AFB." AR 82.

24

Based on these essential facts, a disinterested observer could not reasonably conclude that this order was evidence of anti-white discrimination by Colonel Jones. Instead, the email is evidence of Colonel Jones attempting to retain order at the event by prohibiting plaintiff from setting up an unauthorized and unapproved booth at the festival.

Plaintiff also argued that his emails alleged that Colonel Jones "has taken and will take reprisal against anyone who accuses senior-ranking officers of misconduct." AR 308. The record does not support this allegation. As discussed above, the Board's conclusion that the LOA was not an illegal reprisal was supported by substantial evidence. Moreover, the record is entirely devoid of evidence of, or even allegations of, reprisal against anyone other than plaintiff.

Again, based on the essential facts surrounding the NJP, a disinterested observer could not reasonably conclude that Colonel Jones' actions were evidence of any of the wrongs that plaintiff alleged. Therefore, plaintiff's emails to Colonel Jones were not communications in which plaintiff disclosed information he reasonably believed constituted evidence of a violation of law or regulation and were not protected communications under the MWPA. The Board's conclusion that the NJP was not an illegal reprisal was not arbitrary or capricious.

Plaintiff also argues that the AFMC/IG office misconducted the "Reprisal Acid Test" required under AFI 90-301 for the LOA, and that the DoD/IG office misconducted the Reprisal Acid Test under DoDI 7050.09 for the NJP. These arguments are irrelevant to this court's decision. The Board's conclusion explicitly notes that, "in accordance with 10 USC § 1034, the Board reviewed the evidence of record to reach its own independent determination of whether reprisal occurred." AR 7. It is not within the court's ambit here to evaluate the process or conclusion of either IG office— our jurisdiction is limited to reviewing the conclusions of the Board. Therefore, we do not address whether the reprisal acid tests were misconducted.

There is a difference between being punished for alleging a violation of a law or regulation—i.e., an illegal reprisal—and being punished for the disrespectful way in which an allegation was made. Whistleblower protections do not allow service members to disrespect their superior officers merely because the service member is alleging unlawful conduct. Recognizing as much, the Federal Circuit, in analyzing a similar

25

whistleblower protection statute, stated that: "The [Whistleblower Protection Act] is not a weapon in arguments over policy or *a shield for insubordinate conduct*." *Lachance*, 174 F.3d at 1381 (emphasis added). This rationale is equally applicable to the MWPA: Plaintiff cannot wield the MWPA as a shield for his disrespectful conduct to superior officers.

The throughline here is that both the LOA and the NJP were issued due to the disrespectful manner in which plaintiff confronted his superior officers and made his complaints and objections, not for the allegations of discrimination or other misconduct. There is substantial evidence in the record to support the Board's conclusion that neither the LOA nor NJP were illegal reprisals, and we see no reason to disturb the conclusion of the Board.

Sometimes wisdom dictates not scratching an itch. Plaintiff is entitled to his views about what he deems to be hypocrisy or reverse racism in the military or culture at large. But he was in the military at the time of his comments and conduct. He knew or should have known that his superiors were under the same constraints and could not entertain their subordinate's views as a basis for opening up a general review of military policy or the policy of the government at large. The price he had to pay if he wanted to advocate for those views on the job was to leave the military.

CONCLUSION

Ultimately, we find that substantial evidence supports both the LOA and NJP, and that neither were issued as illegal reprisals. The Board's decision was neither arbitrary nor capricious. For these reasons, the defendant's motion for judgment upon the administrative record is granted and the plaintiff's cross-motion is denied. The Clerk is directed to enter judgment accordingly.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

26